**Louis MELCHIOR, and Bertha K. Melchior, Plaintiffs-Respondents,**

v.

**MADESCO INVESTMENT CORP., Defendant-Appellant.**

**No. 42506.**

Missouri Court of Appeals,
Eastern District,
Division 4.

Aug. 11, 1981.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 21, 1981.

Application to Transfer Denied
Nov. 10, 1981.

---

Donald L. James, Michael Flavin, St. Louis, for defendant-appellant.

Donald W. Bird, Mark Arnold, St. Louis, for plaintiffs-respondents.

SMITH, Judge.

Defendant appeals from a judgment based upon a jury verdict awarding plaintiff Louis Melchior actual damages of $150,-000, and punitive damages of $30,000, and awarding plaintiff Bertha Melchior consortium damages of $50,000.

Louis Melchior slipped and fell on a patch of ice in a garage owned and operated by defendant. The garage is a part of the Bel-Air East hotel and is located on the second, third and fourth floors of the hotel. Like many parking garages, this one is unheated and has large openings on the outside walls. Melchior worked at Edison Brothers, across the street from the Bel-Air, and rented parking space in the Bel-Air on a monthly basis. He was not assigned a regular space. The accident occurred between 3:30 and 4:00 p.m. on January 14, 1977, a Friday. That week was a particularly cold one in St. Louis with maximum temperatures never exceeding 31 degrees and minimums reaching as low as 8 degrees below zero.

Melchior left his place of employment shortly before the accident and went to get his car on the third floor. The skies were gray and overcast. The elevator he took to the third floor was brightly illuminated; the garage itself was dimly illuminated; the floor was dark gray or black; the ceiling was low; there was little outside light. Melchior emerged from the elevator core, into the garage itself, and as he walked looked to each side to be sure no cars were approaching.[1] At that point his feet went out from under him. He landed on his shoulder resulting in injuries hereafter set forth. Melchior had taken several steps from the elevator when he fell. He testified that he did not see the ice until he was

---

1. Melchior testified that he was particularly watchful for cars because he had almost been hit by one while walking in the garage on an earlier occasion.

sitting on it after his fall; that it was black, the same color as the floor; that it was a large sheet of ice ("like a skating rink") and that he had observed isolated pieces of chunk ice and slush which had dropped from automobiles into parking stalls in the garage. The ice upon which he fell was clean, i. e. nothing had been put on it. There were no warning signs or barricades in the vicinity or on the elevator.

Based upon this evidence we reject defendant's first two points that it was entitled to a directed verdict because the danger was open and obvious and that therefore (1) defendant had no obligation to warn of it and (2) that Melchior was contributorily negligent as a matter of law. The ice was the same color as the floor; the garage was dark; Melchior had undergone a severe change of illumination; he had no reason to expect and did not expect a sheet of ice in close proximity to the elevator; he was devoting his senses, as defendant should have expected, to the serious danger of being hit by an automobile utilizing the same area in which he was required to walk. An invitee is not required to peer down as he walks where he has no reason to expect danger. Whether Melchior could in the exercise of ordinary care, have known of the hazard and whether he was negligent in not observing it were questions for the jury. *Cunningham v. Bellerive Hotel, Inc.*, 490 S.W.2d 104 (Mo.1973).

Defendant also contends the evidence was insufficient to support the punitive damage award. That submission was based upon a theory that defendant showed "complete indifference to or conscious disregard for the safety of others . . ." *See* MAI 10.02. We review the evidence on that question in the light most favorable to plaintiff. It is clear that the ice was formed from water leaking from an exposed pipe located just under the ceiling of

the third floor approximately 20 to 25 feet from the elevator core exit. The pipe carried waste water from defendant's laundry located on the fourth floor. It was uninsulated. Several days before the accident water had begun backing up in the laundry. Defendant's chief engineer determined that the back-up resulted from the waste line being frozen. He then utilized a welding torch to thaw it and when it thawed water began to run from a smooth rounded hole at the point where the torch was being applied. The engineer denied that he had burned the hole in the pipe but we think a jury could reasonably infer from the hole as described that he did. At any rate the engineer was immediately aware that the pipe was leaking. This occurred several days before Melchior's fall. At times the leak was a drip, at other times it was a steady stream, depending on the pressure of the waste water from the laundry above.

The engineer did not stop the leak during the week of Melchior's fall although after the fall it was repaired by placing a piece of rubber over the hole and securing the rubber to the pipe with tape.[2] The repair was not permanently made because further along in the pipe at a Y junction the pipe was also frozen and it was necessary to allow the water to escape from the hole in order to continue operation of the laundry. The engineer placed a 55 gallon drum under the leak but because of the variances in flow the waste water did not always go into the drum. Because of this he testified that he also placed a 5 gallon can in the vicinity to catch the water when the pressure changed. There was evidence that only the 55 gallon drum was in the vicinity. Some of the water eluded both cans, and the engineer did not know whether either or both may have overflowed. Over the next several days the engineer noticed that ice

**2.** Part of the engineer's testimony was that he did not use the rubber and tape until several days after the leak when it had thawed. This could be interpreted to mean after the fall when the weather warmed. Another part of his testimony was that he used the rubber and tape soon after the leak occurred but removed it at least once a day in order to drain the laundry water. There was other evidence that the water was leaking during a lot of the day.

The engineer did not indicate he attended the leak and the inferences from his testimony would indicate the contrary.

was building up and spreading in the parking stalls near the leak but denied that he was aware that ice was forming close to the elevator entrance or in the aisle used for walking and driving. Pictures taken the morning after Melchior's fall showed a solid sheet of ice near the elevator entrance as much as an inch thick in places extending into the walking/driving aisle. The engineer made no efforts to remove the ice he saw except from one car located under the leak; did not erect barricades because there was a car located in the stall under the leak; did not spread salt, cinders or chemicals on the ice or near the elevator entrance; was not sure whether he reported the ice to the maintenance personnel; and did not prepare or place any warning signs. From plaintiff's evidence it was established that nothing had been placed on the ice to melt it or increase traction on it.

The circumstances under which punitive damages may be awarded for negligent conduct have been stated as follows:

"In order to justify the infliction of punitory damages for the commission of a tort, the act complained of must have been done wantonly or maliciously . . . (citations omitted). Ordinarily such damages are not recoverable in actions for negligence, because negligence, a mere omission of the duty to exercise care, is the antithesis of willful and intentional conduct . . . (citations omitted) But an act or omission, though properly characterized as negligent, may manifest such reckless indifference to the rights of others that the law will imply that an injury resulting from it was intentionally inflicted . . . (citations omitted) Or, there may be conscious negligence tantamount to intentional wrongdoing, as where the person doing the act or failing to act must be conscious of his conduct, and, though having no specific intent to injure, must be conscious, from his knowledge of surrounding circumstances and existing conditions, that his conduct will naturally or probably result in injury." *Reel v. Consolidated Inv. Co.*, 236 S.W. 43 (Mo.1921) [3]. *See also Sharp v. Robberson*, 495 S.W.2d 394 (Mo.banc 1973); *Smith v. Courter*, 575 S.W.2d 199 (Mo.App.1978) [6, 7]; *Eoff v. Senter*, 317 S.W.2d 666 (Mo. App.1958) [4–6].

■ Whether punitive damages lie against defendant under the above standard must be determined from the conduct of its chief engineer. *Reel v. Consolidated Inv. Co., supra,* [4]; *Smith v. Courter, supra,* [10]. The evidence recited above was sufficient to establish conscious negligence tantamount to intentional wrongdoing in defendant's failure to remove, warn of or barricade the ice. The jury could find that the engineer intentionally created the leak, or at a minimum intentionally permitted it to continue, in order to drain waste water from the laundry to keep it operating. The engineer knew the water was forming ice as it was bound to do in an unheated largely open garage during a prolonged period of sub-freezing temperatures. He was aware that his efforts to catch the water were unsuccessful and that ice had formed on and was spreading further into the parking stalls next to areas used by pedestrians leaving and returning to their cars in this publicly used garage. From the evidence of the conditions found the morning after the fall and from Melchior's testimony the jury could have determined that on the day of the fall substantial ice had formed at the exit from the elevator core and in the walking aisle. Based upon that finding and the engineer's testimony that he checked the status of the leak frequently the jury could conclude that he was well aware of the ice near the elevator entrance. The engineer was also aware of the lighting conditions in the garage and the use of the areas where ice had formed by many pedestrians. In short, the engineer created the dangerous condition knowing it was dangerous and would naturally or probably result in injury, and took no action to prevent such injury. Such conduct showed complete indifference or conscious disregard for the safety of others and was sufficient to support the punitive damage award under the Missouri cases heretofore cited. *See also, Nolin v. National Convenience Stores*, 95 Cal. App.3d 279, 157 Cal.Rptr. 32 (1979) and

*Turner v. Sinclair Refining Co.*, 254 S.C. 36, 173 S.E.2d 356 (1970).

■■ Defendant next complains of instructional error in the verdict directing instruction on Bertha Melchior's claim for consortium damages. The instruction failed to include the word "thereby" mandated by MAI 31.04. This constituted a variation from MAI and was error. Plaintiffs contend that the error was not prejudicial, as there was no dispute that Bertha had sustained some damage as a result of her husband's injury. In *Gooch v. Avsco, Incorporated*, 340 S.W.2d 665 (Mo.1960) (a pre-MAI case) it was held that no prejudicial error occurred there because of the failure in the verdict director to hypothesize the accident as the event causing the spouse to sustain loss or damage. In that case no prejudice was found because the damage instruction conditioned and limited recovery to those losses sustained because of the accident. It was held that that was sufficient to properly define for the jury the plaintiffs' recoverable damages.

In *Novak v. Kansas City Transit, Inc.*, 365 S.W.2d 539 (Mo.banc 1963), recognizing for the first time in Missouri the right of a wife to consortium damages, it was emphasized that such damages arise from losses or damages actually sustained by the wife because of her husband's injury, and are not allowed to her simply because the husband was injured. It was suggested there that the wife be permitted to recover only those elements of consortium which under the particular case represented separate and distinct losses to her. Presumably this was to be accomplished by instruction to the jury.

In *Robben v. Peters*, 427 S.W.2d 753 (Mo. App.1968) the court recognized that the use of the mandated MAI instruction was intended to communicate to the jury the legal requirement that the wife could recover only for damages peculiar to herself caused by the husband's injury. Without the "thereby" the jury might allow recovery simply because the husband sustained injury even though the wife sustained no damage as a result thereof.[3] In *Joly v. Wippler*, 449 S.W.2d 565 (Mo.1970) the Supreme Court held the omission of "thereby" to be prejudicial error, citing with approval *Robben v. Peters, supra*. We are aware that both *Robben* and *Joly* can be distinguished factually, but the thrust of both is that "thereby" serves a function and, in the absence of a clear showing by the plaintiff to the contrary, prejudice from its omission is presumed. We have no such clear showing here. On the evidence in the record the $50,000 award for consortium was excessive. The jury may very well have made that award on the basis that Bertha was entitled to damages simply because her husband was injured, without regard to the loss or damage actually sustained by her.

■ Defendant's remaining point is that the verdict for plaintiff Louis Melchior was excessive. Defendant did not include as part of the record the testimony of plaintiff's medical experts so the contention is not properly before us for resolution. Plaintiffs, however, did file the depositions of the medical experts which were in evidence before the jury. Our review of the evidence and the depositions, ex gratia, does not convince us that the verdict was excessive. Melchior sustained a triple fracture of the humerus, displacement of the ball and socket, and severe tearing of the rotator cuff. He underwent four operations, insertion of a variety of foreign objects into the bones, and his broken bones did not heal for 18 months. He has limited use of his right arm (his dominant arm) and is precluded from many uses of that arm, some of them quite routine. He has constant pain and his condition is not only permanent but likely to deteriorate with age. He was 57 at the time of the accident and had a life expectancy of 17 plus years at that time. He is confronted for the rest of his life with a nearly useless, painful appendage. The verdict was not excessive.

**3.** A persuasive argument can be made that "thereby" does not carry with it a delineation of the elements of consortium comprising the wife's claim for damages, and that either the verdict director or the damage instruction should generally delineate the limited nature of those elements.

Judgment in favor of plaintiff Louis Melchior for both actual and punitive damages affirmed; judgment in favor of plaintiff Bertha Melchior reversed and remanded for new trial on the issue of damages only.

SATZ, P. J., and SIMON, J., concur.